RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0100p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

TERRENCE L. JORDAN (23-3334); DAMARA SANDERS
(23-3347),

*Defendants-Appellants*.

Nos. 23-3334/3347

─────────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:21-cr-00521—Benita Y. Pearson, District Judge.

Argued:  March 20, 2024

Decided and Filed:  May 1, 2024

Before:  GILMAN, MCKEAGUE, and THAPAR, Circuit Judges.

─────────────────────

## COUNSEL

**ARGUED:**  Michael J. Stengel, MICHAEL J. STENGEL, P.C., Memphis, Tennessee, for Appellant Jordan.  Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.  **ON BRIEF:**  Michael J. Stengel, MICHAEL J. STENGEL, P.C., Memphis, Tennessee, for Appellant Jordan.  Russell S. Bensing, Cleveland, Ohio, for Appellant Sanders. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

THAPAR, J., delivered the opinion of the court in which McKEAGUE, J., joined. GILMAN, J. (pp 17–28), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

THAPAR, Circuit Judge.  After a state trooper pulled over Terrence Jordan and Damara Sanders, a jury convicted them of drug and firearm offenses.  On appeal, the two defendants raise several challenges to their convictions.  We affirm in part, vacate in part, and remand for further proceedings.

I.

Damara Sanders was driving a rental car north along Interstate 71 with Terrence Jordan in the passenger seat.  As she drove through Ashland, Ohio, State Highway Patrol Trooper Jeremy Burgett noticed she was driving ninety-one miles an hour—twenty-one over the speed limit.  So he initiated a traffic stop.  During the stop, Trooper Burgett asked for Sanders's license and the car's rental agreement.  One detail in the rental agreement stuck out:  the car had been picked up from a rental facility near Tampa, Florida two days earlier and was due back there the following morning.  Yet Sanders was still driving north.

Puzzled how Sanders would return the car on time, Trooper Burgett asked a few questions about her travel plans.  She explained she was on her way home to Erie, Pennsylvania—seventeen hours away from Tampa.  And she claimed she planned to extend the rental agreement "for a while," but would "eventually" drop it back off in Florida.  Cruiser Footage Video at 10:06–10:14.  When, Burgett asked, would Sanders return the car?  She didn't know.  How long had she been driving?  Since 6 p.m. the day before—in other words, through the night.  All the while, Burgett noticed, Jordan was breathing heavily in the passenger seat.

Trooper Burgett then returned to his cruiser and began preparing a speeding ticket.  Suspicious of Sanders's travel plans and Jordan's heavy breathing, he also called for a canine unit.  About ten minutes later, a sheriff's deputy and his canine partner, Danny, arrived.  Less than two minutes into the sniff, Danny alerted the officers to the presence of drugs.

The officers then removed both defendants from the car, patted them down, and searched the vehicle. During the pat down, a plastic bag containing blue pill fragments fell from Sanders's pocket. And in the car, police found marijuana, pill presses, digital scales, and plastic baggies. They also found a safe containing two pistols, loaded magazines, and a glasses case containing 650 pills split among seven bags. State police later confirmed the pills contained over 70 grams of a fluorofentanyl-fentanyl mixture.

The United States charged Jordan for possessing a firearm as a felon. *See* 18 U.S.C. § 922(g)(1). Additionally, it charged both defendants for (1) possessing a controlled substance with the intent to distribute and (2) possessing firearms in furtherance of drug trafficking. *See* 21 U.S.C. § 841(a)(1); 18 U.S.C. § 924(c)(1)(A). Leading up to the joint trial, the defendants sought to suppress evidence stemming from the traffic stop. They argued Trooper Burgett lacked reasonable suspicion to extend the stop. District Judge Benita Pearson disagreed and denied the motion. *United States v. Jordan*, No. 21-CR-521 (BYP), 2021 WL 4894312 (N.D. Ohio Oct. 20, 2021).

Toward the end of the trial, the parties proposed jury instructions to the court. In particular, the defendants proposed a lesser-included-offense instruction for simple possession of a controlled substance. *See* 21 U.S.C. § 844. The court determined such an instruction wasn't warranted given the drug quantity and distribution paraphernalia introduced at trial. That evidence, according to the court, established the defendants' intent to distribute beyond question.

When it came to the possession-in-furtherance count, the parties overlooked a mistake in the proposed jury instructions. Although the indictment charged Jordan and Sanders for possessing a firearm in furtherance of drug trafficking, the instructions were for using or carrying a firearm during and in relation to drug trafficking—a related, but distinct crime. *See* 18 U.S.C. § 924(c)(1)(A). This error went unnoticed at trial.

The jury convicted on all counts, and the defendants now raise separate appeals. Jordan appeals the denials of his suppression motion and his lesser-included-offense request. Sanders appeals the incorrect jury instruction for the possession-in-furtherance count. She further argues her counsel was ineffective by failing to object to the incorrect instruction. And she claims there

was insufficient evidence to support a possession-in-furtherance conviction. We address each issue in turn.

## II.

First, Jordan argues the district court erred by admitting evidence from the traffic stop. Specifically, he alleges the evidence is the fruit of an unconstitutionally prolonged seizure.

Police typically need reasonable suspicion to initiate a traffic stop. *E.g.*, *Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *United States v. Arvizu*, 534 U.S. 266, 273 (2002). And a stop may last no longer than it takes for the officer to alleviate the concerns that prompted it. *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015). So, if police see someone texting while driving, they're allowed to pull that person over. But only for as long as it takes to perform routine traffic-violation tasks, such as asking a few questions, inspecting the driver's license and registration, and issuing a ticket. To prolong a traffic stop beyond its original "mission," police must have reasonable suspicion of additional wrongdoing. *Id.* at 355 (quotation omitted).

On appeal, Jordan concedes Trooper Burgett had reasonable suspicion to pull Sanders over. And the United States concedes Burgett extended the traffic stop when he withheld Sanders's speeding ticket until the canine unit arrived. So the question is whether Burgett had reasonable suspicion to prolong the stop and perform a drug-dog sniff.

## A.

Reasonable suspicion exists when an officer has "specific and articulable facts" that provide an "objective basis for suspecting legal wrongdoing." *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Arvizu*, 534 U.S. at 273 (quotation omitted). This is a "commonsense" inquiry that requires courts to "slosh [their] way through the factbound morass of reasonableness" in each case. *Ornelas v. United States*, 517 U.S. 690, 695 (1996); *United States v. Johnson*, 482 F. App'x 137, 147–48 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). Supreme Court precedent offers three guideposts for this analysis.

First, otherwise innocent activity can form the basis for reasonable suspicion. *E.g.*, *Arvizu*, 534 U.S. at 274. An officer's suspicion can be (and often is) reasonable even if he doesn't directly witness illegal activity. Likewise, an officer doesn't need to rule out innocuous explanations for suspicious behavior in order for his suspicion to be "reasonable." *Id.* at 277.

Second, when assessing whether reasonable suspicion exists, courts must consider the relevant facts collectively. Courts may not "divide and conquer" the government's proffered bases for suspicion—they may not consider a factor in isolation, ascribe no weight to that factor, repeat for each factor, and then conclude there's no reasonable suspicion. *Id.* at 274–75 (cleaned up). Instead, courts must assess whether everything the officer observed, taken together and in context, is objectively suspicious.

Third, law enforcement may rely on criminal "profiles" when choosing to make or extend an investigative stop. *United States v. Sokolow*, 490 U.S. 1, 10 (1989). When criminals commonly use certain "modes or patterns of operation," officers may be reasonably suspicious of individuals whose behavior fits those patterns. *United States v. Cortez*, 449 U.S. 411, 418 (1981). To be sure, the fact that a suspect matches a "profile" won't always be enough to create reasonable suspicion. *United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir. 1977). Nevertheless, profiles carry "independent evidentiary weight" and, in combination with other evidence, can suffice to extend an investigative stop. *United States v. Urrieta*, 520 F.3d 569, 576 (6th Cir. 2008).

A quick example illustrates how these three principles apply in practice. Wearing a ski mask isn't inherently suspicious. Neither is carrying a firearm. Nor is visiting a local bank. But if a man in a ski mask entered a bank and told employees he's carrying a gun, police would have reasonable suspicion to detain him. That's because, when it comes to reasonable suspicion, the whole is usually greater than the sum of its parts. And in this example, the "whole"—walking into a bank armed, wearing clothing that hides one's identity—matches a bank-robber profile.

B.

Applying these principles here, Trooper Burgett had reasonable suspicion to extend the traffic stop. During the first portion of the traffic stop, Burgett observed the following:

(1) Jordan and Sanders were in a three-day rental car they picked up in Florida; (2) the car was due back near Tampa the next morning, but Sanders was nearly seventeen hours away and still driving north; (3) Sanders had been driving nonstop since 6 p.m. the previous night; (4) Sanders gave implausible explanations for her travel plans; and (5) Jordan was breathing heavily during the stop.[1]

To start, the first three factors fit a drug-courier profile. Given the detection risks involved in mailing or flying, drug couriers commonly rely on rental cars to move drugs across the country. *See United States v. Allen*, 619 F.3d 518, 523 (6th Cir. 2010). Specifically, couriers will often receive drug shipments from "source" cities in southern states like Florida or Texas. *See Sokolow*, 490 U.S. at 3 (Florida); *United States v. Calvetti*, 836 F.3d 654, 659 (6th Cir. 2016) (Texas). While there, couriers will rent a car for a few days and drive cross-country to deliver the drugs to a distributor in another state. Then, they'll head back south to return the car. *E.g.*, *United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir. 2004); *see also United States v. Williams*, 68 F.4th 304, 308 (6th Cir. 2023). Couriers will often make these long-haul trips with few stops, driving straight through the night. *E.g.*, *Williams*, 68 F.4th at 306, 308 (upholding conviction of a courier who drove a rental car through Michigan just one day after the car was spotted nineteen hours away in Houston); *Calvetti*, 836 F.3d at 659 (upholding convictions when drug couriers claimed to have driven twenty-four hours straight from Texas to Michigan). By limiting transit downtime, couriers reduce opportunities for police interdiction and increase the flow of drugs. And by using rental cars, couriers make it harder for police to uncover distribution schemes by tracking specific vehicles. *Cf. Allen*, 619 F.3d at 523.

Our court has previously found reasonable suspicion in situations matching this profile. In *Garrido-Santana*, an officer pulled over a man driving a three-day rental car in Tennessee. 360 F.3d at 568–69, 575; *see also Williams*, 68 F.4th at 307–11. The driver was on his way to New York from Texas, yet the rental was due back in Houston the following day. *Garrido-Santana*, 360 F.3d at 569, 575. Thus, the case presented a close match with a drug-

---

[1]In addition, the government highlights that Sanders initially handed Trooper Burgett an expired rental agreement under someone else's name. After Burgett pointed this out, Sanders promptly handed him the correct agreement. The government, however, doesn't explain why this fact is suspicious, either by itself or in conjunction with other factors.

courier profile:  the defendant had procured a short-term rental car in a source state and embarked on a long haul north, only to quickly return south.  *Id.*; *see also United States v. Palomino*, 100 F.3d 446, 448 (6th Cir. 1996) (noting Texas-origin interstate trips are indicative of drug-courier activity).  Because the defendant fit this profile and presented other suspicious behaviors, including nervousness during the stop, we held there was reasonable suspicion. *Garrido-Santana*, 360 F.3d at 574–75.

Sanders's behavior similarly met this profile.  She rented a car in Florida, a drug source state, for three days and drove cross-country overnight.  *Cf. Calvetti*, 836 F.3d at 667.  The rental was due back near Tampa less than twenty-four hours later.  *Cf. Garrido-Santana*, 360 F.3d at 575.  Given that it takes seventeen hours to drive from Erie to Tampa, Sanders would've had little time—just enough time to drop off a few packages—before she'd have to head back to Florida.  Thus, like the defendant in *Garrido-Santana*, Sanders presented a close match for a drug-courier profile.[2]

Sanders's explanation of her travel plans only exacerbated her itinerary's suspiciousness. When Trooper Burgett asked about the car's impending due date, Sanders explained she planned to extend the rental.  According to Jordan, this explanation obviated any suspicion stemming from the rental's tight timeframe.  But Burgett reasonably doubted Sanders's explanation.  After all, she had just obtained the car two days earlier.  If she planned to keep it "for a while," why did she only arrange for a three-day rental period—just long enough to drive up to Pennsylvania, turn around, and drive back to Florida?

Sanders's other comments provided even more reasons to doubt her explanation.  If she was heading home after visiting a relative near Tampa, why get a rental that needed to be returned *in Florida*?  Why not get a one-way rental?  Likewise, if Sanders planned to extend the rental, why wait until less than a day before the due date?  By that point, she was nearly

---

[2]Jordan notes our decision in *Garrido-Santana* predates the Supreme Court's decision in *Rodriguez*. There, the Court held that police must have reasonable suspicion to extend a traffic stop for a drug-dog sniff.  575 U.S. at 355.  But *Garrido-Santana* operated under that assumption, so it's consistent with *Rodriguez*.  360 F.3d at 574–75.

seventeen hours from the return site.  Had the rental company declined her extension, she'd have been forced to head back to Florida immediately.

In sum, instead of allaying suspicion about her route, Sanders's implausible explanations only added to the suspicion.  *See, e.g.*, *United States v. Hill*, 195 F.3d 258, 272 (6th Cir. 1999); *see also United States v. Townsend*, 305 F.3d 537, 543 (6th Cir. 2002) ("[L]ying about travel plans can form the basis for reasonable suspicion.").  Indeed, "dubious travel plans are a weighty factor in establishing reasonable suspicion to extend [a] stop."  *Williams*, 68 F.4th at 308 (quotation marks omitted).

Lastly, we have Jordan's heavy breathing, which the district court characterized as "nervous demeanor."  *Jordan*, 2021 WL 4894312, at *5.  To be sure, our court has made clear that nervousness alone is a weak basis for suspicion.  *See United States v. Stepp*, 680 F.3d 651, 665 (6th Cir. 2012).  Nevertheless, nervousness can contribute to reasonable suspicion in combination with other factors, such as questionable rental-car arrangements—precisely what we have here.  *See id.* at 666–67.

Moreover, Jordan's nervousness is more probative of criminality than defendants' nervousness in other cases.  That's because the government usually points to the *driver's* nervousness as a basis for suspicion, which isn't indicative of much.  *See, e.g.*, *United States v. Smith*, 263 F.3d 571, 591–92 (6th Cir. 2001).  After all, most drivers don't enjoy being pulled over.  The prospects of an expensive ticket, insurance premium increases, or a suspended license perturb even the most innocent drivers.  By contrast, it's less clear why a *passenger* would be nervous.  Indeed, passengers usually don't interact with police at all during a traffic stop.  Thus, a passenger's nervousness is less readily explainable.  Even so, it's usually not enough by itself to create reasonable suspicion.  *See United States v. Mesa,* 62 F.3d 159, 163 (6th Cir. 1995); *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004).  Nonetheless, when combined with the other facts here, Jordan's nervousness is more suspicious than in cases like *Garrido-Santana*, when the driver was the nervous one.

Given the totality of the circumstances, Trooper Burgett had reasonable suspicion to prolong the traffic stop.  The travel plans here—taking a short-term rental from a source state on

a seventeen-hour, cross-country road trip—were indicative of drug-courier activity.   When combined with Sanders's implausible responses and Jordan's nervousness, there was enough to justify further investigation.

C.

None of our caselaw dictates a different outcome.   At the outset, the Supreme Court has acknowledged that a reasonable-suspicion determination in any given case "will seldom be a useful 'precedent'" in another.   *Ornelas*, 517 U.S. at 698 (quotation omitted).   That's because the reasonable-suspicion inquiry is a totality-of-the-circumstances analysis, and the outcome often hinges on case-specific factual nuances.   *See Arvizu*, 534 U.S. at 274.   Accordingly, this case is readily distinguishable from traffic-stop cases in which there wasn't reasonable suspicion.

For instance, contrast this case with *Joshua v. DeWitt*, 341 F.3d 430 (6th Cir. 2003). There, we held that "(1) [a] discrepancy in the rental car papers; (2) the furtive movements made by [the defendant] and his companion during the traffic stop; (3) the illogical route given by [the defendant] regarding his travel plans; and (4) [the defendant's] and his companion's nervousness" weren't enough to establish reasonable suspicion.   *Id.* at 442 (internal quotation marks omitted).

*Joshua* is inapplicable here for several reasons.   First, Sanders's travel plans were considerably more suspicious—and a much closer match to a drug-courier profile—than the defendant's in *Joshua*.   In *Joshua*, the officer thought the defendant's route from Columbus, Ohio to Portsmouth, Ohio didn't make sense.   *Id.* at 435.   Here, Sanders drove from Tampa to Erie, through the night, in a rental due back in Florida the next day, without any plans of returning.   A peculiar jaunt across the Buckeye State is a far cry from Jordan and Sanders's cross-country, overnight, out-and-back trek.

More broadly, *Joshua*'s approach to reasonable suspicion stands in tension with Supreme Court precedent.   In parts of the opinion, *Joshua* engages in the divide-and-conquer analysis that the Supreme Court has expressly repudiated.   *See Arvizu*, 534 U.S. at 274–75.   Specifically, *Joshua* considered (and rejected) each proffered basis for reasonable suspicion as "an independent factor that could have supported . . . continued detention."   341 F.3d at 443.   But as

we mentioned earlier, the reasonable-suspicion inquiry asks whether all the factors, considered in totality, are enough to justify detention—not whether each "independent factor" could create reasonable suspicion.

Further, *Joshua* declined to find reasonable suspicion on the grounds that the "cited conduct could be perfectly consistent with innocent behavior." *Id.* at 445. This approach also conflicts with binding precedent. Reasonable suspicion can arise from innocent behavior, and police need not rule out innocent explanations to be reasonably suspicious of a defendant. *Arvizu*, 534 U.S. at 274, 277. Indeed, in *Terry v. Ohio*, the seminal reasonable-suspicion case, the Supreme Court upheld a seizure based *entirely* on innocent behavior. *Id.* at 274 (citing *Terry*, 392 U.S. at 22). To the extent *Joshua* is inconsistent with *Terry* or *Arvizu*, it isn't binding here.

Our decisions in *Richardson*, *Bell*, and *Smith* are similarly inapplicable. None involved the drug-courier indicators present here. In *Richardson*, the defendants weren't even in a rental car. *See* 385 F.3d at 627. And while *Bell* and *Smith* involved rental cars, neither presented an interstate road trip in a short-term rental due back in a source state the next day. *See Smith*, 263 F.3d at 592 (noting the officer didn't "[ask] further questions regarding [the defendants'] travel plans, destination or business"); *United States v. Bell*, 555 F.3d 535, 540 (6th Cir. 2009) (noting the court didn't credit the only fact related to the car's rental status). In sum, none of these cases involved the drug-courier travel patterns present here and in *Garrido-Santana*.

D.

Jordan raises several counterarguments, but none avails him.

*First*, Jordan challenges the characterization of his heavy breathing as "nervousness." He contends his heavy breathing could have stemmed from a medical condition, rather than nervousness. But that's true of almost all nervous behaviors. People fidget, stutter, and avoid eye contact for all sorts of reasons. But that doesn't mean police must rule out every non-nervous explanation before finding these behaviors suspicious. Indeed, our court frequently treats heavy breathing and nervousness collectively when assessing reasonable suspicion. *See, e.g.*, *United States v. Samuels*, 443 F. App'x 156, 160 (6th Cir. 2011); *United States v. Howard*, 815 F. App'x 69, 76 (6th Cir. 2020); *United States v. Frazier*, 249 F. App'x 396, 399, 402 (6th

Cir. 2007); *United States v. Patterson*, 852 F. App'x 1004, 1008 (6th Cir. 2021). The district court didn't err when it did the same.

*Second*, Jordan emphasizes that Trooper Burgett never explained what he meant when he said he was "not tracking" Sanders's proffered travel plans. Cruiser Footage Video at 9:54. He probably meant he was having trouble making sense of her strange itinerary. In any event, whatever Burgett meant by that phrase is irrelevant. The operative question is whether Sanders's travel plans, her implausible explanations, and Jordan's heavy breathing would have been suspicious to a reasonable officer. *See Williams*, 68 F.4th at 310 ("[O]bjective realities, not subjective concerns, form the basis for reasonable suspicion."); *Whren v. United States*, 517 U.S. 806, 813–15 (1996). Whatever Burgett subjectively thought about Sanders's travel plans is immaterial.[3]

*Third*, Jordan flags that Trooper Burgett didn't ask Sanders certain follow-up questions. Burgett didn't ask about how extending a rental works, why Sanders had such a short-term rental, or why Jordan was breathing heavily. According to Jordan, these questions could have easily confirmed or allayed Burgett's suspicions, and it was unreasonable for him not to ask them.

There are numerous problems with this argument. To start, Trooper Burgett didn't need to rule out every innocent explanation to have reasonable suspicion. *See Arvizu*, 534 U.S. at 277. Once an officer "ha[s] seen and heard enough," he may detain a car and its occupants for further investigation. *Williams*, 68 F.4th at 306. That's what happened here: Burgett asked Sanders about her rental's suspicious timeline, and her implausible answers pushed the situation over the reasonable-suspicion line.

Moreover, it's unclear how asking additional questions would have changed the reasonable-suspicion calculus. What innocent explanation could there be for two people to drive home in a rental car that's due a thousand miles away the next day? Jordan hasn't offered one. And even if Sanders could have concocted an innocent cover story on the spot, it would've been

---

[3]Jordan's allegation that Burgett admitted he was "operating on a hunch" is similarly irrelevant. Reply Br. 7. Our inquiry focuses on what the officer observed, not the officer's subjective interpretation of that evidence.

reasonable for Burgett to doubt it. After all, Sanders had already strained her credibility by giving implausible explanations for her trip. Thus, it was reasonable for Burgett to stop asking questions when he did.

What's more, asking additional questions would have only prolonged the stop. Yet Burgett's decision to prolong the stop is precisely what Jordan objects to. Detaining a driver to ask questions beyond the "ordinary inquiries incident to [a] traffic stop" requires just as much suspicion as detaining a driver for a drug-dog sniff. *Rodriguez*, 575 U.S. at 355 (cleaned up). In this respect, Jordan's argument is self-defeating: Burgett wasn't allowed to prolong the stop (for a drug-dog sniff) because he failed to prolong the stop (to ask additional questions).

If anything, Trooper Burgett's decision to stop asking questions was faithful to Supreme Court precedent. Even when there's reasonable suspicion, officers should limit themselves to "the least intrusive means reasonably available to verify or dispel" their suspicion. *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality op.). Burgett's conduct here passed that test. Rather than pepper Sanders with probing questions about her travel habits or Jordan's respiratory health, Burgett ordered a dog sniff—a minimally intrusive way to investigate wrongdoing. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) ("[A dog sniff] generally does not implicate legitimate privacy interests."). And here, waiting for the canine unit to arrive extended the stop only a few minutes longer than it took to prepare the ticket.

*Fourth*, Jordan tries to downplay the suspiciousness of his and Sanders's travel plans by pointing to pandemic-era travel restrictions. Yet, pandemic or not, their travel plans still made no sense. To be sure, in the early days of the coronavirus outbreak, many people drove instead of flying. But that doesn't explain why Sanders and Jordan would drive seventeen hours to Erie in a rental car due in Florida the next day. Moreover, if flying wasn't an option for them, how were they going to get back home after returning the car in Florida? And how did they get to Tampa in the first place? Like Sanders's answers to Trooper Burgett, Jordan's post-hoc, blame-the-pandemic explanation generates more questions than it answers.

*Fifth*, Jordan highlights that Trooper Burgett struggled to hear Sanders at a few points during the traffic stop. But Jordan fails to explain how that diminishes reasonable suspicion

here.  After all, Jordan doesn't dispute the relevant parts of Sanders and Burgett's conversation.
So this argument also fails.

*

In short, Trooper Burgett had specific, articulable facts that justified his suspicion.  Thus,
Judge Pearson was correct to deny the defendants' suppression motion.

III.

Jordan next argues the district court erred by not giving a lesser-included-offense
instruction for possessing a controlled substance (i.e., without the intent to distribute).  District
courts should give a lesser-included-offense instruction when (1) the defendant requests
the instruction, (2) the lesser offense's elements are a subset of the greater offense's elements,
(3) the evidence supports a conviction on the lesser offense, and (4) the parties sufficiently
dispute the element differentiating the two crimes, such that a reasonable jury might convict on
the lesser offense while acquitting on the greater offense.  *See United States v. Monger*, 185 F.3d
574, 576 (6th Cir. 1999).  Here, the parties debate the fourth factor only.  We conclude Jordan
didn't sufficiently dispute intent.

At trial, the government offered copious evidence of Jordan's and Sanders's intent
to distribute drugs.   Police discovered over 70 grams—650 pills worth—of a
fluorofentanyl-fentanyl mix.  A government witness indicated this was a distribution-level
quantity, enough to "very easily kill everybody in [the courtroom] multiple times over."  R. 158,
Pg. ID 1662.  *Compare Monger*, 185 F.3d at 575–77 (requiring a lesser-included instruction
when defendant possessed 10.66 grams of cocaine base and 9 grams of marijuana, and a witness
testified these were personal-use amounts), *and United States v. Jaffal*, 79 F.4th 582, 606
(6th Cir. 2023) (instruction required; 36 grams of heroin), *with United States v. Hampton*, 769 F.
App'x 308, 310–12 (6th Cir. 2019) (no instruction required when police found 128 grams of
methamphetamine, which a witness considered a distribution-level amount).  What's more, the
pills were divided across seven plastic bags, suggesting the drugs were intended for several
recipients—not just Jordan and Sanders.  *Cf. Talley v. United States*, 573 F. App'x 410, 413–14
(6th Cir. 2014) (declining to issue a lesser-included instruction when cocaine was split across

seven bags); *Hampton*, 769 F. App'x at 312. As one witness put it, there was "absolutely" no way the drugs were for Jordan's and Sanders's personal use. R. 158, Pg. ID 1661.

The United States also introduced the scales, pill presses, firearms, and ammunition found near the drugs. These items are drug dealers' tools of the trade: dealers usually weigh the drugs they buy and sell, compress powdered drugs into pills for distribution, and protect the drugs and cash involved in these transactions. *See Hampton*, 769 F. App'x at 312 ("[P]roximity to the loaded firearm, and presence of the small baggies and digital scale [are] also indicative of distribution."). As the bow on top of this drug-distribution package, the defendants' courier-type itinerary only reinforced the inference they were shuttling drugs for distribution.

To warrant a lesser-included instruction, Jordan must meaningfully challenge the government's evidence or point to countervailing evidence of his own. *Cf. Jaffal*, 79 F.4th at 606. On appeal, he does neither. Jordan doesn't point to *any* evidence cutting against an intent to distribute. For instance, he doesn't provide evidence that he or Sanders were heavy fentanyl users who planned to ingest all 650 pills themselves. *Cf. id.* Nor does he explain why he was bringing pill presses and scales on a cross-country drive with 70 grams of fentanyl mix. *See Talley*, 573 F. App'x at 413. Jordan similarly fails to clarify why he'd separate his personal-use fentanyl pills into seven different bags. *Id.* And he doesn't meaningfully challenge the relevant government witness: he doesn't point to anything specific, such as bias or a lack of expertise, that would cast doubt on that witness's testimony.

Instead, Jordan argues only that he never admitted any plans to distribute the pills, and that the jury didn't need to believe the government witness. But neither argument creates an evidentiary dispute. The fact Jordan didn't admit an intent to distribute drugs isn't evidence that he lacked such an intent. Nor is the abstract possibility that the jury might find a particular witness uncredible.

Presented with ample evidence of distribution and none to the contrary, the district court correctly denied Jordan's request for a lesser-included-offense instruction.

IV.

Moving next to Sanders's claims:  she argues we should vacate her possession-in-furtherance conviction because the district court gave the wrong jury instruction.  The United States agrees, so we vacate both defendants' convictions on that count only.

Because we vacate that conviction, we need not address Sanders's ineffective-assistance argument.  That challenge applies only to her now-vacated possession-in-furtherance conviction and is therefore moot.  *See United States v. Tunning*, 69 F.3d 107, 115 (6th Cir. 1995).  Nonetheless, we must still address her sufficiency-of-the-evidence challenge.  *Patterson v. Haskins*, 470 F.3d 645, 650–51 (6th Cir. 2006); *see also United States v. Orrico*, 599 F.2d 113, 119 n.5 (6th Cir. 1979).  That's because, unlike reversal for an incorrect jury instruction, reversal for insufficient evidence would bar Sanders's retrial.  *Burks v. United States*, 437 U.S. 1, 15, 18 (1978).

"Evidence is only insufficient when, viewing it in the light most favorable to the state, no rational juror would find guilt beyond a reasonable doubt."  *James v. Corrigan*, 85 F.4th 392, 395 (6th Cir. 2023) (citing *Jackson v. Virginia*, 443 U.S. 307, 317–19 (1979)).  "This is a nearly insurmountable hurdle."  *Id.* (quotation marks omitted).  Sanders doesn't meet it.

The United States charged Sanders with possessing a firearm in furtherance of a drug-trafficking crime.  *See* 18 U.S.C. § 924(c)(1)(A).  Thus, the government needed to prove (1) Sanders possessed a firearm, (2) she committed a drug-trafficking crime, and (3) she possessed the firearm in furtherance of that crime.  *United States v. Maya*, 966 F.3d 493, 499 (6th Cir. 2020).  Sanders disputes only the third element, which requires the government to prove she possessed the gun to aid her drug trafficking.  *Id.* at 501.

The government introduced sufficient evidence on this point.  Police found two firearms in Sanders's locked safe alongside her and Jordan's drug supply.  And "[w]hen a weapon is found in a locked safe placed alongside contraband, there is sufficient evidence for a jury to determine that a defendant is in possession of a firearm in furtherance of a drug-trafficking crime."  *United States v. Volkman*, 797 F.3d 377, 391 (6th Cir. 2015).

Sanders's lone counterargument is unavailing.  She emphasizes that because the firearm was locked away in a safe, she couldn't have readily used it.  But the easy accessibility of a firearm isn't an "absolute mandate" for upholding a possession-in-furtherance conviction.  *Maya*, 966 F.3d at 501.  After all, our court has noted that a gun "kept in a locked safe" suffices.  *Id.*; *see Volkman*, 797 F.3d at 391.

*          *          *

We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

---
CONCURRENCE / DISSENT
---

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part.  I concur in all aspects of the majority's opinion other than its disposition of Jordan's motion to suppress.  Specifically, I believe that Trooper Burgett's search of the defendants' rental car was based on nothing more than an ill-defined hunch.  I therefore dissent from the portion of the opinion that affirms the decision of the district court to deny Jordan's motion to suppress.

## I.  ANALYSIS

**A.     Trooper Burgett relied only on an ill-defined hunch to support the search in question**

To start with, the majority gleans "three guideposts" from Supreme Court precedent with regard to motions to suppress.  Majority Op. at 4.  Conspicuously absent from the majority's analysis, however, is a crucial fourth guidepost:  that reasonable suspicion does not arise from "inarticulate hunches." *Terry v. Ohio*, 392 U.S. 1, 22 (1968); *see also Navarette v. California*, 572 U.S. 393, 397 (2014) ("[A] mere 'hunch' does not create reasonable suspicion.") (citation and internal quotation marks omitted).  This court likewise requires more than an "ill-defined hunch" to support a warrantless search. *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016) (quoting *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008)) ("Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity.").

The government combines the following factors to support reasonable suspicion in the present case:  (1) Sanders initially handing Burgett an outdated rental agreement (a factor that even the majority concedes is not suspicious); (2) Jordan's heavy breathing; (3) the fact that Jordan and Sanders were driving away from where the rental car was due the next day after driving through the night; and (4) supposedly inconsistent answers from Sanders about her travel plans.  Given that the majority concedes that the first factor relied on by the government is not suspicious, I will limit my analysis to the last three factors listed.

Although courts may not use a "divide-and-conquer" approach in analyzing the factors supporting reasonable suspicion, *United States v. Arvizu*, 534 U.S. 266, 274 (2002), *overruled in part on other grounds by Davis v. Washington*, 547 U.S. 813 (2006), the relevant factors "must be examined in some orderly fashion, which typically involves a brief discussion of each factor and its weight in the analysis." *United States v. Smith*, 263 F.3d 571, 591 (6th Cir. 2001). Our analysis, moreover, may not rely on factors that the police officer in question did not rely on. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) ("The court cannot determine that an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely.").

The government first points to Jordan's heavy breathing as a factor to support reasonable suspicion. But this court has consistently held that nervousness is a weak and unreliable indicator of criminal activity during a traffic stop. *See, e.g.*, *United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004) ("[A]lthough nervousness has been considered in finding reasonable suspicion in conjunction with other factors, it is an unreliable indicator, especially in the context of a traffic stop. Many citizens become nervous during a traffic stop, even when they have nothing to hide or fear.") (internal citations omitted); *United States v. Stepp*, 680 F.3d 651, 665 (6th Cir. 2012) ("We have held on numerous occasions, however, that nervousness is 'an unreliable indicator, especially in the traffic context.'") (quoting *id.* at 630); *United States v. Bell*, 555 F.3d 535, 540 (6th Cir. 2009) (similar). This court has likewise observed that "without additional evidence of wrongdoing, nervousness is entitled to no weight." *United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008).

The government next relies on the fact that the defendants were traveling away from the location where the car was due 18 hours later. This fact, according to the government, shows that the defendants' travel plans were impractical and impossible. The government's related factor supporting reasonable suspicion is that Sanders's explanations concerning her itinerary were inconsistent and suggestive of criminal activity.

But upon further questioning, there was nothing "impossible" about the defendants' trip. Sanders explained to Burgett that she planned to extend the rental agreement with Hertz and have the car "for a while." And a Hertz employee testified at trial that Hertz customers can

"more often than not" extend the length of their initial proposed return date.  In response to the defendants' travel plans, all Burgett managed to articulate was a general hunch that "[it] just doesn't make sense that they're driving all the way through [to Pennsylvania]." Burgett, however, "had no articulable reason to suggest that people do not undertake such journeys." *See Townsend*, 305 F.3d at 543.

As this court has noted in similar circumstances, "the allegedly conflicting explanations of [the defendants'] travel plans are not mutually exclusive; it is entirely plausible that the group" planned to return home and extend the rental.  *See Richardson*, 385 F.3d at 631.  The factors offered by the government are therefore weak because they are "subject to significant qualification." *Townsend*, 305 F.3d at 545.  Even if Sanders had not provided an explanation for these allegedly "impractical" travel plans, this court has previously held that "nervousness and illogical travel plans could not give rise to an inference supporting a reasonable suspicion of criminal activity." *Joshua v. Dewitt*, 341 F.3d 430, 445 (6th Cir. 2003) (quotation marks omitted).

The totality of the circumstances therefore show that (1) Jordan breathed heavily in the passenger-side seat of the rental car, (2) the occupants were traveling away from where the rental car was due after driving through the previous night, but explained that they planned to extend the rental, and (3) Burgett was unpersuaded by Sanders's allegedly inconsistent explanation of her itinerary.  Putting these facts together, however, shows that Burgett relied on a combination of weak factors that were equally consistent with innocent behavior.  In the absence of any "stronger indicators of criminality," such "minor factors" are collectively insufficient to qualify as reasonable suspicion under this court's precedents.  *See Townsend*, 305 F.3d at 545.

Indeed, in *Stepp*, this court observed that "an officer's knowledge that a defendant has a criminal history is not enough to create reasonable suspicion, even when combined with other weak indicators such as nervousness and illogical travel plans."  680 F.3d at 667.  But here, we have only the combined factors of heavy breathing and illogical travel plans.  We lack the additional factor concerning the defendant's criminal history, which further illustrates the absence of reasonable suspicion.

In sum, given that we lack any stronger indications of criminality, I believe that reasonable suspicion is absent. *See Townsend*, 305 F.3d at 545 ("Although the government has pointed to several factors. . . which we have recognized as valid . . . , they are all relatively minor, and in many cases, are subject to significant qualification. The fact of the matter is that this case lacks any of the stronger indicators of criminal conduct that have accompanied these minor factors."). I therefore believe that Burgett relied "on an impermissible, ill-defined hunch." *See Urrieta*, 520 F.3d at 578.

**B.      The majority creates its own reasonable-suspicion factors based on unsupported generalities and facts that are absent from the record**

The majority claims that reasonable suspicion is present because the defendants' travel plans "fit a drug-courier" profile. Maj. Op. at 6. Nothing in the record, however, supports this overbroad generalization.

The majority, for example, claims that, "[g]iven the detection risks involved in mailing or flying, drug couriers commonly rely on rental cars to move drugs across the country." *Id.* But the majority fails to cite anything in the record to support this generality. The majority instead relies on a passing piece of testimony from a police officer in a completely unrelated case concerning an unrelated legal claim to the one at issue here. *See id.*

Next, the majority claims, without any record support, that "couriers will often receive drug shipments in 'source' cities in southern states like Florida or Texas." *Id.* It cites *United States v. Sokolow*, 490 U.S. 1, 3 (1989), and *United States v. Calvetti*, 836 F.3d 654, 659 (6th Cir. 2016), for this sweeping proposition. But *Sokolow*'s reference to Miami as a "source" city is irrelevant to the present case because the defendants here were traveling from Tampa, not Miami. And *Calvetti* does not identify Texas as a state containing any source cities. *See also Townsend*, 305 F.3d at 543 (agreeing that "[t]here were simply too many source and destination cities" for a trip from an alleged source city to "bear the suspicion that the officers seek to attach").

The majority likewise maintains that "[c]ouriers will often make these long-haul trip with few stops, driving straight through the night." Maj. Op. at 6. But the majority cites only two

cases as examples for this generalization, and fails to cite anything said by Burgett to support that statement. The majority further fails to provide any support for its claim that "[b]y limiting transit downtime, couriers reduce opportunities for police interdiction and increase the flow of drugs." *Id.*

Nothing in the record suggests that Burgett relied on any of these sweeping and unsupported generalities. Indeed, Burgett never discussed so-called "source cities" or "drug-courier profiles" in his testimony. Consequently, he did not testify about how these factors influenced his decision to extend the traffic stop. This fact is critical because our reasonable-suspicion analysis does not permit us to give weight to factors not actually relied on by the police officer. *Townsend*, 555 F.3d at 541 ("The court cannot determine that an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely."). But the majority disregards this controlling precedent and crafts its own factors to retroactively justify Burgett's illegal search.

The government likewise does not rely on the slew of generalities concerning so-called "source cities" or "drug-courier profiles" to justify Burgett's allegedly reasonable suspicion. That is presumably because Burgett's testimony does not support these overbroad claims.

Moreover, the majority relies on another erroneous generalization. The majority claims that Jordan's heavy breathing as a passenger is more probative of criminality than the defendants' nervousness in other cases "because the government usually points to the *driver's* nervousness as a basis for suspicion, which isn't indicative of much." Maj. Op. at 8 (emphasis in original). But this generalization is easily disproved by the number of cases in which the government has repeatedly pointed to passengers' nervousness as a basis for suspicion. *See, e.g.*, *United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008) ("The government next suggests that the 'nervousness' of Urrieta's passengers contributed to Deputy Young's suspicions of illegal activity."); *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (concluding that nervousness was a weak indicator where the government relied on the passengers' nervousness); *United States v. Stepp*, 680 F.3d 651, 658 (6th Cir. 2012) (involving a case where the government pointed to the nervousness of both the passenger and the driver).

The majority purports to back up this incorrect generalization by musing that

> most drivers don't enjoy being pulled over. The prospects of an expensive ticket, insurance premium increases, or a suspended license perturb even the most innocent drivers. By contrast, it's less clear why a *passenger* would be nervous. Indeed, passengers usually don't interact with police at all during a traffic stop.

Maj. Op. at 8 (emphasis in original). Yet in cases like this, where the vehicle occupants are Black, and the police officer is White, one can readily understand why a Black passenger might be nervous, given that "African-Americans are more likely to be arrested because drug courier profiles reflect the erroneous assumption that one's race has a direct correlation to drug activity." *United States v. Harvey*, 16 F.3d 109, 115 (6th Cir. 1994) (Keith, J., dissenting). This assumption coincides with the well-documented "driving while black" phenomenon, *United States v. Warfield*, 727 F. App'x 182, 188 (6th Cir. 2018), in which police officers pull over Black occupants pretextually on the basis of race. *See also United States v. Johnson*, 823 F.3d 408, 412 (7th Cir. 2016) (Hamilton, J. dissenting) ("The phenomenon of police seizures for 'driving while black' has long been recognized.").

"Driving while black" remains front of mind for Black passengers and drivers alike because "the burden of aggressive and intrusive police action falls disproportionately on African-American" males like Jordan. *See Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996). In sum, there is good reason for a Black passenger like Jordan to "breathe heavily" during a traffic stop that has nothing to do with being a drug courier. Burgett's (and the majority's) inference to the contrary is nothing short of rank speculation.

**C.     This court's precedents require suppression of the illegally-obtained evidence**

The majority also states that "[n]one of our caselaw dictates a different outcome." Maj. Op. at 9. It specifically contends that this "court has previously found reasonable suspicion in situations matching" Sanders's behavior, relying particularly on *United States v. Garrido-Santana*, 360 F.3d 565 (6th Cir. 2004). Maj. Op. at 6. But an examination of *Garrido-Santana* clearly shows that the majority omits several key facts from that case in arriving at its conclusion.

When the defendant in *Garrido-Santana* was stopped by a police officer for a speeding violation, evidence capable of supporting reasonable suspicion soon became apparent to the officer. The officer, for example, realized that the model of car driven by the defendant was well-known to have a gas tank compartment commonly used to hide narcotics. *Id.* at 569. And when the officer asked for the rental agreement, the officer learned that the car had been rented in Houston by a different person—a New York resident. *Id.* at 575. The agreement also did not list the defendant as a driver; it simply had the defendant's illegible signature next to the name of the other individual who had rented the car. *Id.* at 569. This was suspicious because "ninety-nine percent of the rental agreements that [the officer] had seen listed the name of the additional driver in the same type of print in which the renter's name was listed." *Id.* at 572.

After asking about the defendant's travel plans, the officer learned that the defendant flew from Puerto Rico to Miami, and then to Houston, only to rent a car to drive to New York, which was considered "circuitous and impractical." *Id.* at 575. The officer further observed that the agreement provided that the vehicle was due back in Houston the next day. *Id.* at 569. Also noted by the officer was that the defendant nervously laughed, avoided eye contact, and fidgeted. *Id.*

Putting these facts together, the officer inquired about whether the defendant possessed narcotics. Although the defendant denied such possession, he consented to a search, which yielded drugs. The defendant nevertheless challenged the officer's constitutional authority to make the inquiry. He argued that the officer's questioning required additional justification beyond the traffic stop. This court, however, ultimately ruled against the defendant and concluded that the questioning at issue was permissible because the officer had reasonable suspicion that criminal activity was afoot in light of the totality of circumstances discussed above.

In the present case, the totality of the circumstances differ significantly from those in *Garrido-Santana*. The only alleged suspicious activities here that were present in *Garrido-Santana* are purportedly nervous defendants and the fact that the rental car was travelling in a direction away from the location where it was due the next day. But in *Garrido-Santana*, the officer had the additional suspicious circumstances mentioned above.

Those additional key facts are absent here, and the majority fails to address how their absence factors in its analysis.

In contrast, this court's decision in *Joshua v. Dewitt*, 341 F.3d 430 (6th Cir. 2003), is directly on point. The habeas petitioner in that case was pulled over for a speeding violation while driving a rental car. *Id.* at 434. He appeared "nervous and suspicious" after being pulled over and, when the officer asked about the petitioner's travel plans, the route described "didn't make any sense what so ever." *Id.* at 435 (internal quotation marks omitted). The officer also learned that the petitioner "was a known drug courier." *Id.* This court nevertheless held that, "although past criminal activity is a factor that can be taken into consideration, in this case it does not create reasonable suspicion when considered in tandem with Petitioner's alleged nervousness, unarticulated furtive gestures, and 'illogical' travel route." *Id.* at 446.

In the present case, just as in *Joshua*, the government points to an occupant's purported nervousness and allegedly inconsistent travel plans to justify the extension of the traffic stop. But as the *Joshua* court held, this was insufficient to establish reasonable suspicion. The facts of *Joshua* are actually closer to establishing reasonable suspicion than here because the officer there considered the petitioner's past criminal history as a drug courier, and "past criminal activity is a factor that can be taken into consideration." *Id.* But that additional factor is absent here, and therefore serves as another reason why the majority's analysis is misguided.

The majority's effort to distinguish *Joshua* falls short. First, the majority claims that "Sanders's travel plans were considerably more suspicious—and a much closer match to a drug courier's profile." Maj. Op. at 9. The problem with this statement is that the *Joshua* court expressly considered the petitioner's "past criminal activity" as a drug courier "in tandem with" several other factors. *Joshua*, 341 F.3d at 446. And an officer's knowledge that someone is an established drug courier is a much stronger indicator of "a drug courier profile" than simply speculating that someone is a drug courier based on their travel plans. The majority likewise dismisses the petitioner's travel plan in *Joshua* as a "peculiar jaunt across the Buckeye State," but provides no reason why people with so-called "drug-courier profiles" are less likely to do illicit drug business within state lines. Maj. Op. at 9.

Furthermore, the majority critiques *Joshua* as incorrectly decided because it allegedly "engages in the divide-and-conquer analysis" repudiated by the Supreme Court. *Id.* As an initial matter, our panel cannot overrule the decision of another panel. *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). The majority's divide-and-conquer analysis of *Joshua*, moreover, is flawed. In *Joshua*, this court considered the relevant factors together and held that the facts did "not create reasonable suspicion when considered in tandem with Petitioner's alleged nervousness, unarticulated furtive gestures, and 'illogical' travel route." *Joshua*, 341 F.3d at 446. It also concluded that the factors "considered individually or collectively, still do not give rise to reasonable suspicion." *Id.* at 447.

The majority incorrectly states that the factors in *Joshua* were considered only on an individual basis simply because the court listed each factor individually. Maj. Op. at 9. But as this court expressly noted in *United States v. Smith*, 263 F.3d 571, 591 (6th Cir. 2001), the relevant factors "must be examined in some orderly fashion, which typically involves a brief discussion of each factor and its weight in the analysis."

The majority finally claims that *Johsua* conflicts with Supreme Court precedent because *Joshua* states that the "cited conduct could be perfectly consistent with innocent behavior." Maj. Op. at 10. But neither *Terry v. Ohio*, 392 U.S. 1 (1968), nor *United States v. Arvizu*, 534 U.S. 266 (2002), require us to completely ignore innocent behavior. Their key point is instead to view the relevant circumstances as a whole. *Terry*, 392 U.S. at 22 (observing that the facts of *Terry* were "perhaps innocent in itself . . . [but] taken together warranted investigation"); *Arvizu*, 534 U.S. at 273 (holding that courts "must look at the totality of the circumstances of each case" under the reasonable-suspicion analysis) (quotation marks omitted). This is precisely what the *Joshua* court did. And, contrary to the majority's interpretation that *Joshua* is inconsistent with Supreme Court precedent, this court has repeatedly cited *Joshua* favorably. *See, e.g.*, *United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012); *United States v. Jackon*, 188 F. App'x 403, 412 (6th Cir. 2012).

The circumstances in the present case are also analogous to those in this court's decision in *United States v. Richardson*, 385 F.3d 625 (6th Cir. 2004). In that case, an officer stopped a vehicle for following another car too closely. The vehicle contained three individuals who

became very nervous when talking with the officer.  One occupant's hand trembled, another had a quivering lip, and the third spilled the contents of her purse.  The occupants also provided allegedly conflicting information about their travel plans.  One passenger stated that the occupants were returning from visiting a lawyer, whereas the other passenger claimed that they were returning from a trip to see a doctor.  A subsequent search yielded an unlawfully possessed firearm.

The government in *Richardson* argued that these facts were sufficient to demonstrate reasonable suspicion justifying the search, but this court disagreed.  This court observed the following:  "The government combines the following factors: (1) Nervousness . . . ; (2) Allegedly conflicting explanations of their travel plans; and (3) [a passenger's] movement to the driver's seat." *Id.* at 630.  The *Richardson* court first dispensed with the argument that nervousness suggested criminality by noting that nervousness "is an unreliable indicator, especially in the context of a traffic stop." *Id.*  With respect to the allegedly conflicting travel plans, the court concluded that "the allegedly conflicting explanations of their travel plans are not mutually exclusive; it is entirely plausible that the group traveled both to see a doctor and a lawyer." *Id.* at 631.  And finally, regarding the passenger who moved to the driver's seat, this court noted that even the officer who conducted the search "was not concerned [about that movement] . . . , and the United States has made no attempt to explain why such behavior would be suspicious." *Id.* at 631. The court therefore held that the officer lacked reasonable suspicion to conduct a search of the car. *Id.*

So too here.  Just as in *Richardson*, the alleged inconsistency between the rental agreement's requirement to return the car the next day and Sanders's plan to keep the car after the return date "are not mutually exclusive." *See id.*  That is because "it is entirely plausible" that Sanders would extend the rental agreement given her stated intent on doing so. *See id.*  This fact is especially plausible here because Sanders had a lot of experience in renting cars. And Hertz customers can "more often than not" extend the length of their initial proposed return date.

In addition, just as in *Richardson*, the heavy breathing exhibited by Jordan "is an unreliable indicator, especially in the context of a traffic stop." *See id.* at 630.  The nervousness in *Richardson* was in fact much more pronounced than in the present case, given that the three

occupants in that case had trembling hands, quivering lips, and such extreme nervousness as to cause one of them to spill the contents of her purse. By contrast, the only purported nervousness here was Jordan's heavy breathing. The totality of the circumstances in the present case are therefore quite similar to *Richardson*, where this court suppressed the incriminating evidence despite the nervousness of the occupants and their allegedly inconsistent travel plans.

Finally, this court's decision in *United States v. Townsend*, 305 F.3d 537 (6th Cir. 2002), highlights the majority's divergence from precedent. When the defendants in that case were pulled over, they "produced dubious travel plans" that included travelling from Chicago, Illinois to Columbus, Ohio to visit Townsend's sister. *Id.* at 543. But when one of the officers asked Townsend what his sister's address was, he could not recall. *Id.* Moreover, the plans were suspicious because the speed at which the defendants were traveling would have resulted in them arriving at the sister's house "between 4:00 and 5:00 AM." *Id.*

The officers in *Townsend* also claimed that "the defendants were traveling from a source city for narcotics . . . to a destination city for narcotics." *Id.* Other relevant factors included that (1) the defendants "appeared nervous," (2) the officers learned that one defendant had been previously arrested on a weapons charge, (3) the driver was not the registered owner of the car (which was a drug courier-activity according to one of the officers), and (4) the defendants carried three cell phones, which the officers argued were "tools of the drug trade," as well as "rolls of currency in each of their pockets." *Id.* at 544–45.

This court nonetheless held that all of these factors together were still insufficient to create reasonable suspicion. It observed that "lying about travel plans can form the basis for reasonable suspicion," but noted that "the officer had no articulable reason to suggest that people do not generally undertake such journeys." *Id.* at 543. Moreover, the court considered the allegation concerning the defendants' possession of three cell phones as "tools of the drug trade" a "weak" factor. *Id.* at 544. It dispelled the officers' concerns that the defendants were travelling from a source city to a source destination by noting that "w[e] are far from the situation in *United States v. Arvizu* . . . in which the defendants were travelling on an infrequently used road, directly from the Mexican border, when a paved, but more patrolled highway was available." *Id.* at 543–544. The court labeled the rest of the factors as "valid

considerations . . . [but] all relatively minor," and held that there was no reasonable suspicion. *Id.* at 545.

Relevant considerations from *Townsend* are present here. Like the defendants in *Townsend*, Jordan and Sanders initially produced dubious travel plans. But unlike *Townsend*, the defendants' situation in the present case is even less suspicious because Sanders explained that she was planning on extending the car rental after she returned home from visiting a relative. But even if Sanders had not provided this explanation, Burgett "had no articulable reason to suggest that people do not undertake such journeys." *Id.* at 543. As noted above, all Burgett managed to articulate was a hunch that "[it] just doesn't make sense that they're driving all the way through." This case also lacks the additional factors in *Townsend* that included (1) the "slightly odd" presence of three cell phones, which were alleged to be drug-trade tools, (2) the fact that Townsend was not the registered owner of the car, and (3) the knowledge that one of the defendants was arrested on a weapons charge. *Id.* at 544–45.

## II. CONCLUSION

In sum, the above precedents highlight that incriminating evidence was suppressed under circumstances where there was greater evidence of criminality than in the present case. This leads me to the conclusion that Burgett's search of the defendants' rental vehicle was based on nothing more than an ill-defined hunch rather than on reasonable suspicion. I would therefore vacate Jordan's convictions and remand this case to the district court for further proceedings.