RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0102p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

    *v.*

VAN GEFFREY WILLIAMS (22-1024); JAMAR JOCKESE BLOOM (22-1038),

        *Defendants-Appellants*.

Nos. 22-1024/1038

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cr-00050—Hala Y. Jarbou, District Judge.

Argued:  May 1, 2023

Decided and Filed:  May 17, 2023

Before:  GILMAN, READLER, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Kathryn M. Brown, SQUIRE PATTON BOGGS (US) LLP, Columbus, Ohio, for Appellant in 22-1024.  Jeffery A. Taylor, Sterling Heights, Michigan, for Appellant in 22-1038. Timothy VerHey, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:**  Kathryn M. Brown, SQUIRE PATTON BOGGS (US) LLP, Columbus, Ohio, Benjamin C. Glassman, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, for Appellant in 22-1024.  Jeffery A. Taylor, Sterling Heights, Michigan, for Appellant in 22-1038. Timothy VerHey, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

————————————

**OPINION**

————————————

CHAD A. READLER, Circuit Judge.   Van Williams was pulled over for a traffic violation.   A search of the car he was driving turned up cocaine and methamphetamine. Williams and his passenger, Jamar Bloom, unsuccessfully sought to suppress the drugs and other evidence on the theories that the officers' traffic stop was unconstitutionally overlong and that one of the resulting arrests was unsupported by probable cause.   Each then pleaded guilty to a federal drug crime, preserving the suppression issues for appeal.   Seeing no error in the district court proceedings, we affirm.

I.

One of the main interstate thoroughfares across the wrist of Michigan's mitten, highway I-94 snakes up through the state's southwest corner from Indiana.   Michigan State Police Officer Stephanie Lay was stationed in the highway's median, about 35 miles from where the Wolverine and Hoosier states meet.   Lay noticed a Chevrolet Tahoe driving northbound following closely behind another vehicle—a state law infraction.   Lay pulled out to follow the Tahoe.   En route, she ran the vehicle's plate through a computer database, which noted that the car had been in Houston, Texas, one day before.

Lay pulled the Tahoe over and approached on the passenger side.   Van Williams was the driver, and Jamar Bloom was sitting in the passenger seat.   Unprompted, Bloom handed over his driver's license without making eye contact with Lay.   Lay requested the same, as well as proof of insurance, from Williams.   Williams produced his driver's license and a rental agreement for the car.   Lay told Williams to exit the Tahoe (so she could hear him better) and asked about his itinerary.   Williams stated that he had been on vacation in Indiana and was headed to Detroit to see his father.   Lay pressed Williams as to why he was in Indiana.   Williams said he was a laborer and gave Lay a business card.   When Lay asked additional questions, Williams became defensive.

Returning to her cruiser, Lay ran Williams's and Bloom's information through law-enforcement databases and radioed for assistance. Williams's name came up clean. But as to Bloom, Lay was notified that he was on probation for a prior crime. While Lay was running these checks, Officer Byron Bierema, who had been patrolling a neighboring stretch of road, arrived on-scene with his drug-detection K-9 to assist. Approximately seven minutes into the stop, Lay completed her database checks and again exited her cruiser, this time to speak with Bloom about his probation status.

Bloom was less than forthcoming. When Lay asked where Bloom was coming from, Bloom said "somewhere around the Indiana-Michigan border," without additional specificity. And when Lay inquired about his destination, Bloom answered "Saginaw" before later saying he was going to see an aunt in Detroit. Lay returned to speak with Williams. He refused to tell her where he had picked up Bloom or whether Bloom had accompanied him in Indiana. At that point, Lay decided she had seen and heard enough. She requested Williams's consent to search the car, which he withheld. She then ordered him to stand back while Bierema's K-9 conducted a sniff of the Tahoe's exterior. The K-9 alerted to the presence of drugs, prompting the officers to search the car. In the back seat, they found two gym bags containing cocaine and methamphetamine.

Defendants were indicted for possession with intent to distribute drugs, in violation of federal law. Invoking the Fourth Amendment's prohibition on "unreasonable searches and seizures," defendants moved to suppress the drug evidence. They argued that the traffic stop was unconstitutionally prolonged. Bloom added that he was illegally arrested. After a hearing, the district court denied the motions. Each defendant then pleaded guilty under an agreement permitting us to review the suppression issues, to which we turn now.

II.

The Fourth Amendment confers protection against "unreasonable" searches and seizures by government officials. U.S. CONST. amend. IV. As one genre of "seizure," Lay's traffic stop fell within the Amendment's ambit. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). There is no dispute over the propriety of Lay's initial basis for the stop—the traffic violation.

Yet even where a traffic stop is originally predicated on the requisite reasonable suspicion of illegal activity, the stop's duration may still exceed constitutional limits. *United States v. Whitley*, 34 F.4th 522, 528–29 (6th Cir. 2022) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The initial length of the stop may stretch as long as the officer reasonably needs to complete the "mission" for which it began. *Id.* at 529 (quoting *Rodriguez*, 575 U.S. at 354). Ordinarily, as here, the mission includes issuing a ticket for the violation that occasioned the stop and attending to "related safety concerns." *Rodriguez*, 575 U.S. at 354. But once that initial mission has (or reasonably should have) concluded, if the officer wants to continue the stop for other reasons, she must demonstrate an additional modicum of reasonable suspicion. *Whitley*, 34 F.4th at 529. As for the warrantless vehicle search and arrest of defendants that followed the traffic stop, probable cause was required for both. *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (arrest); *Hernandez v. Boles*, 949 F.3d 251, 259 (6th Cir. 2020) (vehicle search). We review each of the district court's conclusions on these legal issues de novo, checking its underlying findings of fact under the clear-error standard. *Whitley*, 34 F.4th at 528.

A.1. Reasonable suspicion supported Lay's decision to detain defendants past the time that her initial mission ended. Again, all agree that the pullover was justified at the outset by Williams's traffic violation. *See United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016) (reaching the same conclusion based on a violation of Tennessee law). Similarly, there is no dispute that Lay "diligently" undertook tasks incident to the initial stop. *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *United States v. Lott*, 954 F.3d 919, 924 (6th Cir. 2020). Those tasks included checking Williams's license, registration, and rental agreement as well as asking both defendants "context-framing" questions about their travel history and plans. *Lott*, 954 F.3d at 924 (quoting *Rodriguez*, 575 U.S. at 355); *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010), *abrogated on other grounds by Rodriguez*, 575 U.S. at 357. Lay's initial mission ended when she approached the car for a second time, because at that point she either could have issued a ticket or allowed Williams or Bloom to leave. *Rodriguez*, 575 U.S. at 354–55; *Whitley*, 34 F.4th at 531–32.

Instead, Lay extended the stop. Did she have grounds to do so? The bar is low. Reasonable suspicion requires only that the officer have "a moderate chance" of finding

evidence of illegality on further investigation. *United States v. McCallister*, 39 F.4th 368, 373–74 (6th Cir. 2022) (quoting *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370–71 (2009)). That said, the officer must have more than a "hunch" or "gut feeling" that something illegal is afoot. *Id.* at 374 (citation omitted). In assessing whether reasonable suspicion existed, we "take the facts together," giving due weight to the officer's "experience and specialized training." *Id.* (citation omitted).

What Lay heard and saw during those initial seven minutes clears the not "particularly high" hurdle of reasonable suspicion. *United States v. Belakhdhar*, 924 F.3d 925, 928 (6th Cir. 2019) (citation omitted). Start with the numerous oddities and inconsistencies regarding defendants' travel. Before the stop began, Lay knew the rental car had been in Houston the morning before, almost a 19-hour drive away. Williams told Lay that he was on vacation in Indiana, but immediately thereafter produced a business card and explained that he was a laborer. Putting aside the peculiarity of this mixture of business and pleasure, Lay knew that any R&R could only have lasted a few hours, given the distances involved. What is more, Williams claimed to be headed to Detroit, but was several hours off the most direct route between Houston and that city. And then consider the fact that Williams never proffered any information about Houston. Taking all of this together, Williams's "dubious travel plans" are a weighty factor in establishing reasonable suspicion to extend the stop. *See United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016) (quoting *United States v. Stepp*, 680 F.3d 651, 666 (6th Cir. 2012)).

Entitled to somewhat less weight, though still relevant to the overall reasonable suspicion inquiry, are the other facts that Lay learned before re-entering her cruiser. They include that defendants were traveling between what Lay testified to be a known source and destination for drug trafficking, their use of a rental car, and the oddity of Bloom not making eye contact when he handed over his driver's license. We have characterized as weak the significance of analogous facts in the reasonable inquiry calculus, suggesting that some could not independently support reasonable suspicion. *Stepp*, 680 F.3d at 665–66 (nervousness and rental cars); *United States v. Urrieta*, 520 F.3d 569, 576–77 (6th Cir. 2008) (travel on drug route). But weak support is support nonetheless, particularly when considered as part of a single mosaic along with the

unusual travel evidence. *McCallister*, 39 F.4th at 374; *see also United States v. Pacheco*, 841 F.3d 384, 393 (6th Cir. 2016) (same for nervousness).

The discovery that Bloom was on probation cemented Lay's burgeoning reasonable suspicion. Probation ordinarily restricts an individual's ability to move out of state, at least without prior notice to a probation officer. Recall that Lay pulled defendants over roughly 35 miles from the border, on an interstate highway, headed deeper into Michigan. So she was within constitutional limits to exit her cruiser and to inquire of Bloom whether he was in compliance with his probation conditions. *Cf. United States v. Navarette*, 996 F.3d 870, 875 (8th Cir. 2021) (reasonable suspicion to continue a traffic stop existed where a suspect on probation for a firearm offense was seen with a loaded gun magazine, "likely" in violation of probation conditions).

Subsequent conversations with Bloom and Williams added another layer to this mountain of reasonable suspicion, warranting Lay's extension of the stop through the point when Bierema's K-9 sniffed the Tahoe. *See United States v. Ahmed*, 825 F. App'x 589, 592–93 (10th Cir. 2020) (reasonable suspicion existed where officers observed indicia of possible drug-related activity alongside more generically suspicious behavior). Almost immediately, Bloom added to the "dubious[ness]" of Williams's earlier statements when he told Lay that he was going home to Saginaw, with a stop in Detroit—though Williams had mentioned only Detroit. *See Calvetti*, 836 F.3d at 667. The picture became no clearer when Lay asked for additional details about Bloom's travel history. He told her, without elaboration, that Williams had picked him up "somewhere around the Indiana-Michigan border." *See United States v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010) ("[V]ague, inconsistent or evasive answers with respect to travel plans [are] supportive of reasonable suspicion."). And when Lay reapproached Williams, he refused to answer whether Bloom accompanied him in Indiana or where he had picked Bloom up, instead becoming increasingly defensive. *See id.*; *United States v. Winters*, 782 F.3d 289, 299 (6th Cir. 2015). Putting all of these pieces together, Lay had reasonable suspicion sufficient to delay the traffic stop a few minutes further while Bierema led his K-9 through a sniff of the car's exterior. *McCallister*, 39 F.4th at 374.

2. Defendants see things differently. Williams argues that, despite properly considering the traffic stop to have ended when Lay finished her database checks, the district court nevertheless improperly considered the officer's subsequent actions to fit within the stop's parameters. In so doing, Williams says, the district court permitted what amounted to a "de minimis" extension of the stop. Sanctioning that kind of brief prolongation would run afoul of *Rodriguez*, which held that any time (no matter the duration) added to a traffic stop beyond what was reasonably necessary to investigate the original cause for the stop must be grounded in independent reasonable suspicion. *See Hernandez*, 949 F.3d at 256 (describing *Rodriguez*). But Williams misunderstands the suppression proceedings. The district court held that Lay asked appropriate "context-framing" questions of Williams during her first approach of his vehicle. And after checking her databases, Lay "learned sufficient facts to give reasonable suspicion" justifying further detention. Her additional questioning, in other words, was not an illegal de minimis extension, but rather one supported by independent reasonable suspicion. *Whitley*, 34 F.4th at 532.

Williams also takes issue with the evidence the district court relied on in finding that reasonable suspicion developed during the stop. Acknowledging that an officer may rely only on evidence of reasonable suspicion apparent during the initial stop to validate a prolongation, *United States v. Torres-Ramos*, 536 F.3d 542, 552 n.8 (6th Cir. 2008), Williams contends that the district court improperly counted evidence that Lay discovered after the initial mission ended in deciding that the stop's prolongation was justified. Not so. True, the district court's list of relevant evidence included pieces that Lay learned after her initial mission ended. But the court considered two categories of evidence: information known to Lay before the initial mission ended, which allowed her to extend her interrogation of defendants, and, separately, facts that came later, which bolstered the reasonable suspicion that had already developed. Read as a whole, the district court's opinion properly sanctioned a traffic stop, in the words of our sister circuit, "fairly responsive to the emerging tableau." *United States v. Dion*, 859 F.3d 114, 124–25 (1st Cir. 2017) (citation omitted).

Williams also faults the district court for including Bloom's probationary status in its reasonable suspicion analysis. It should not have done so, he argues, because Lay testified that she did not consider Bloom's status to be "part of my reasonable suspicion." We have said before that our reasonable suspicion analysis should not turn on "a factor on which the officer did not actually rely." *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (citing *United States v. Lott*, 870 F.2d 778, 783–84 (1st Cir. 1989)). *But see United States v. Sheckles*, 996 F.3d 330, 344 (6th Cir. 2021) ("The lawfulness of a stop does not turn on the subjective 'motivation' of the officer making it; it turns on the objective facts justifying the stop." (citation omitted)). It bears noting, however, that a First Circuit decision we cited in crafting that rule was itself recently overturned. *See United States v. Guerrero*, 19 F.4th 547, 557 (1st Cir. 2021). That case, *Lott*, held that an officer could reasonably frisk a temporary detainee for weapons only if he actually thought the detainee posed a safety risk. 870 F.2d at 783–84. But later Supreme Court cases made clear that objective realities, not subjective concerns, form the basis for reasonable suspicion. *Guerrero*, 19 F.4th at 556 (citing *Maryland v. Buie*, 494 U.S. 325, 334 (1990); *Whren v. United States*, 517 U.S. 806, 812 (1996); *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019); *Kentucky v. King*, 563 U.S. 452, 464 (2011); *Ashcroft v. Al-Kidd*, 563 U.S. 731, 736 (2011); and *Florida v. Jardines*, 569 U.S. 1, 10 (2013)). Faced with the tension between these cases and its prior rule, the First Circuit abandoned *Lott*'s consideration of an officer's subjective fears. *Id.* at 557.

To the extent that the approach we adopted from the First Circuit was ever good law, it has been overtaken by the tidal wave of intervening, contrary Supreme Court precedent. Williams's argument, though, suffers from an additional flaw: his challenge amounts to asserting that the district court, which held that Lay relied on Bloom's status, clearly erred in its understanding of Lay's testimony. But we accord the district court "great deference" in fact finding, given its proximity to the evidentiary process, and will not overturn its account of the evidence unless it is implausible "in light of the record viewed in its entirety." *United States v. Loines*, 56 F.4th 1099, 1108 (6th Cir. 2023) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)). We see no reason to do so. Elsewhere in her testimony, Lay stated that when she reapproached the car, she was "investigating a possible probation violation." Can that statement be reconciled with the one Williams quotes? Yes, when read in context.

The testimony Williams excerpts reads "I don't believe that was even part of my reasonable suspicion."  It comes after a series of questions pertaining to defendants' dangerousness, culminating with a reference to the "officer safety caution" flag that Lay saw when she ran Bloom's name.  In other words, it is at least plausible that Lay was saying she did not consider potential danger to be a reason to reapproach the car, but that she did consider the probation violation to merit an additional conversation with Bloom.  And the district court so found.  At bottom, because the district court's characterization was not implausible in light of all of the hearing evidence, we will not disturb it.  *Id.*

At oral argument, Williams suggested a final reason to find his prolonged detention unconstitutional:  He argued that even if Bloom's probationary status gave Lay reason to hold Bloom, she had to permit Williams to leave.  But because Williams did not raise this point in his opening brief, we will not consider it.  *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) (citation omitted).

B.  We likewise see no constitutional flaw in the search of the rental car and defendants' subsequent arrests.  Each search was required to be grounded on probable cause.  *Wesby*, 138 S. Ct. at 586; *Hernandez*, 949 F.3d at 259.  Though a higher bar than reasonable suspicion, probable cause is a similarly "fluid concept," *Wesby*, 138 S. Ct. at 586 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)), requiring "only a probability or substantial chance of criminal activity."  *Id.* (citation omitted).  The drug-sniffing dog's positive indication to the scent of narcotics in the car established probable cause for the search.  Where a dog is properly "certified," its positive alert alone is sufficient.  *Whitley*, 34 F.4th at 536 (quoting *Florida v. Harris*, 568 U.S. 237, 246–47 (2013)).  That is the case here.  And the discovery of drugs in the gym bags on the back seat gave Lay probable cause to arrest both defendants.  *See Maryland v. Pringle*, 540 US 366, 371–72 (2003).

Bloom disputes the latter point.  To his mind, "[c]onstructive possession" of the cocaine and methamphetamine was not established prior to his arrest.  But remember the legal standard that we employ.  Probable cause asks only whether what the officers saw established a "probability or substantial chance" that the suspect is engaged in criminal activity.  *Wesby*, 138

S. Ct. at 586. Everything Lay and Bierema saw, up to and including the gym bags they found, cumulatively met that bar.

\* \* \* \* \*

The judgment in each case is affirmed.