NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0433n.06

No. 24-5536

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Sep 23, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| FRANKIE L. MOFFITT, | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: CLAY, GIBBONS, and STRANCH, Circuit Judges.

**CLAY, Circuit Judge.** Defendant Frankie Moffitt was sentenced to thirty-seven months in prison and three years of supervised release after he pleaded guilty to one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Prior to his guilty plea, the district court denied Moffitt's motion to suppress evidence discovered in his car after law enforcement officers pulled him over for a traffic violation. Moffitt argues on appeal that the district court committed a reversible error by denying his motion to suppress. For the reasons set forth below, we **REVERSE** the judgment of the district court.

## I. BACKGROUND

Moffitt's conviction for unlawful firearm possession stems from a local law enforcement officer's discovery of a pistol stored in the hood of Moffitt's car. The traffic stop that led to the search and the discovery of the pistol was partially captured on two video recordings from officers' body cameras. The traffic stop and subsequent search of Moffitt's vehicle are discussed below.

## A. Factual Background

On the night of May 17, 2021, Moffitt was pulled over by law enforcement officers from the Simpson County Sheriff's Office while driving along Nashville Road in Simpson County, Kentucky. One of those officers was Deputy Sheriff Wyatt Harper, whose activation of his patrol car's emergency police lights prompted Moffitt to pull over to the side of the road.[1] Once Moffitt pulled over and Harper parked his patrol car behind Moffitt's vehicle, Harper exited the patrol car, approached Moffitt's driver's side door, and greeted Moffitt before remarking that Moffitt had been "swerving all over the place." Ex. A ("Bodycam #1"), R. 21, at 0:00-0:19. Moffitt, who was retrieving his wallet from his pants pocket with his driver's side window rolled down at the time Harper approached, then handed Harper two items, including his driver's license, from his wallet while explaining that he had been attempting to use a GPS device prior to being pulled over.[2] As Moffitt handed Harper the first item, Harper asked Moffitt where he was heading. Moffitt responded that he was driving to see his romantic partner in Franklin, Kentucky. After Moffitt

---

[1] In addition to Harper, two other law enforcement officers are visible in the body camera footage produced by the government. Neither of those officers is identified by name in the record.

[2] The district court's order denying Moffitt's motion to suppress states that Harper "asked for Moffitt's driver's license." Mem. Op. & Order, R. 41, Page ID #146. The district court's factual basis for this statement is not apparent from the record. The district court partially adopted the findings of fact from a magistrate judge's recommendation, but the magistrate judge's report does not mention Harper's request for Moffitt's driver's license. The transcript of an evidentiary hearing conducted by the magistrate judge also does not contain a reference to this request. In addition, footage from Harper's body camera shows that Moffitt handed his driver's license to Harper without express prompting by Harper. To the extent any details of the traffic stop and search as relayed in either the district court's order or the magistrate judge's partially adopted recommendation are clearly contradicted by the record evidence, we will not reproduce or rely on those details in this opinion. Instead, consistent with the applicable standard of review, we only recount those facts supported by the evidence before the district court at the time of its motion to suppress ruling. *See United States v. Bell*, 555 F.3d 535, 538 n.3 (6th Cir. 2009) (discounting a district court's factual findings in motion to suppress order that were "contradicted by [a] video"); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007) (noting that a Court of Appeals "should have viewed the facts in the light depicted by [a] videotape").

handed Harper the items from his wallet, Harper asked Moffitt to pull into a nearby parking lot so that their vehicles would not obstruct traffic. Harper then returned to his patrol car, and he and Moffitt drove their respective cars to the parking lot.

After arriving at the parking lot, Harper directed a fellow officer to exit the patrol car, stand behind the bumper of Moffitt's car, and observe Moffitt in case Moffitt was "trying to tuck stuff." *Id.* at 1:25-1:32. Harper then used information from Moffitt's driver's license to run a search for outstanding arrest warrants. Harper's search did not identify any arrest warrants for Moffitt. Harper then exited his patrol car and returned to the driver's side window of Moffitt's car. Once at the window, Harper asked Moffitt for his vehicle registration. Moffitt then leaned over to his car's glove compartment, where he retrieved a clear plastic bag containing multiple pieces of paper. While Harper shined a flashlight inside Moffitt's car, Moffitt emptied the bag's contents onto his lap, retrieved his car registration from the documents, and handed the registration to Harper. Moffitt then proceeded to put the remaining pieces of paper back into the plastic bag.

While Moffitt put the documents into the bag, Harper, who was still holding Moffitt's vehicle registration, asked Moffitt several questions. First, Harper asked Moffitt where his romantic partner lived. Moffitt responded to Harper by naming the street on which his romantic partner resided. After clarifying the street name, Harper next asked Moffitt if he previously lived in Springfield, Kentucky. Moffitt answered that he still lived in Springfield. Following that response, Harper asked Moffitt what he had been doing at a hotel before the traffic stop. Moffitt explained again that he had been entering an address into his GPS device prior to the traffic stop.

Immediately after Moffitt finished detailing his use of the GPS device, Harper, who remained in possession of Moffitt's vehicle registration, asked Moffitt during the following colloquy if he had any illegal items in the car and if he would consent to a search of the car:

> Harper:   Is there anything illegal in the vehicle?
>
> Moffitt:   Nope.
>
> Harper:   None whatsoever?
>
> Moffitt:   Nope.
>
> Harper:   You have any issues with me searching it?
>
> Moffitt:   Um, no.
>
> Harper:   You don't have any issues with it?
>
> Moffitt:   No.
>
> Harper:   I can search, is that what you're saying?
>
> Moffitt:   Yeah, you can search.
>
> Harper:   Okay, alright—no weapons or anything?
>
> Moffitt:   Nothing.
>
> Harper:   Okay, hop out for me real quick, bud.  I'll make it quick for you.

*Id.* at 3:40-3:56.  Moffitt then opened the driver's side door and exited his car.  Harper subsequently directed Moffitt to the back of the car so that another deputy sheriff could frisk Moffitt to detect potential weapons.  After frisking Moffitt, the officer directed Moffitt to the rear of the patrol car, which was parked behind Moffitt's car.  While at the rear of the patrol car, Moffitt spoke with the officers who were not searching his vehicle.  At one point, Moffitt asked one officer if he wanted Moffitt to open his car's trunk to aid the search.  The officer deferred, stating, "That's up to you, man.  If [Harper] wants to look in there, he'll ask."  Ex. A ("Bodycam #2"), R. 31, at 3:01-3:05.

Meanwhile, after Moffitt had exited his car, Harper began searching inside the vehicle, including by shining his flashlight in the car's interior, opening crumpled napkins on the car's seats, and rummaging through the contents of the glove compartment and a small bag located in the front of the car.  After searching the interior of Moffitt's car for approximately five minutes, Harper eventually proceeded to the front of the car, where he lifted the car's hood.  After lifting the hood, Harper located a bag containing a nine-millimeter pistol in the car's engine compartment.

Following his discovery of the pistol, Harper walked to the patrol car, where Moffitt was standing with another law enforcement officer, and directed the other officer to handcuff Moffitt. Moffitt then asked if he had an outstanding arrest warrant, to which Harper responded that Moffitt had a gun under the hood of his car.[3] Harper next walked back to the hood of Moffitt's car before returning to where Moffitt stood, now handcuffed, by the rear of the patrol car. Harper and Moffitt then had the following exchange:

> Harper: Alright, I'm going to read you something real quick.
>
> Moffitt: I thought you said you wanted to search my car, though?
>
> Harper: I did. Isn't the hood a part of the car?
>
> Moffitt: I guess, if that's what you want to say.

Bodycam #1, R. 21, at 9:37-9:53. Harper then advised Moffitt of his rights to counsel and to remain silent.

### B. Procedural History

Following this encounter and his arrest, on December 15, 2021, a federal grand jury in the Western District of Kentucky returned a one-count indictment charging Moffitt with possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Moffitt eventually moved to suppress the evidence obtained from the May 17, 2021, search of his vehicle. The district court referred Moffitt's motion to a magistrate judge, who held a suppression hearing on Moffitt's motion at which Moffitt testified and the body camera footage from the traffic stop

---

[3] Due to a previous felony conviction, Moffitt was prohibited by federal law from possessing a firearm. Upon being asked, Moffitt had informed the officers of his criminal history while Harper was searching his car.

was submitted into evidence.[4]  During the suppression hearing, Moffitt testified that he intended to give the officers searching his car consent "[t]o search the inside of [his] car and possibly the trunk," but not to search the engine compartment or otherwise disassemble the car during the search.  Suppression Hr'g Tr., R. 31, Page ID #59.  Moffitt further explained that, during his three decades of driving, including multiple experiences of being pulled over by police, officers had never searched under the hood of the cars he drove.

Following the suppression hearing, Moffitt and the government filed dueling briefs in support and opposing Moffitt's motion to suppress.  Moffitt argued that his motion to suppress should be granted because (1) the officers unconstitutionally prolonged the traffic stop past the time necessary to investigate and issue a citation for the traffic violation; (2) his consent to search the vehicle and subsequent failure to revoke consent during the search were involuntary; and (3) his consent to Harper's search of the car did not extend to a search of the car's engine compartment.  In contrast, the government contended that Moffitt's motion should be denied because the traffic stop was validly extended by Moffitt's consent to the search of his car, which was voluntary, unequivocal, and permitted Harper to search the entirety of the car.

The magistrate judge ultimately issued findings of fact and conclusions of law recommending that the district court grant Moffitt's motion to suppress.  In doing so, the magistrate judge held that (1) Harper unreasonably extended the traffic stop in violation of the Fourth Amendment by asking Moffitt about illegal items in his car and (2) Moffitt had consented to a search of his entire vehicle, including under the hood of the car.  The government and Moffitt

---

[4] Harper and the other officers present during the traffic stop did not testify at the suppression hearing.  The record below does not contain a report from the officers documenting the traffic stop nor any statements from the officers apart from their recorded remarks on the body camera footage.

subsequently filed timely objections to the magistrate judge's findings and recommendations, with the government objecting to the magistrate judge's recommendation that the traffic stop had been unreasonably extended, and Moffitt objecting to the magistrate judge's recommendation concerning the scope of Moffitt's consent to search his car.

On September 1, 2023, the district court issued a written order sustaining the government's objections to the magistrate judge's recommendation and denying Moffitt's objections and motion to suppress. The district court held that Harper did not impermissibly extend the vehicle stop in contravention of the Fourth Amendment because "[t]he request to search and Moffitt's consent occurred during the time period when tasks tied to the traffic infraction [were]—or reasonably should have been ongoing." Mem. Op. & Order, R. 41, Page ID #147 (internal quotation marks omitted). In addition, the district court held that Moffitt's consent to the search provided the officers "permission to search the vehicle without limitations" because the consent "lacked an express limitation which would have put an objectively reasonable person on notice that the scope of the consent was constrained." *Id.* at Page ID #149.

Following the district court's ruling, Moffitt entered into a plea agreement with the government and pleaded guilty to possession of a firearm by a prohibited person.[5] The district court subsequently sentenced Moffitt to 37 months in prison and three years of supervised release. Moffitt filed a timely notice of appeal on June 4, 2024.

## II. DISCUSSION

Moffitt does not contend on appeal that the officers lacked reasonable suspicion to initiate the traffic stop which led to Harper's discovery of the pistol under the hood of his car. Instead,

---

[5] Pursuant to his plea agreement, Moffitt retained the ability to appeal the district court's denial of his motion to suppress.

Moffitt argues that the district court erred in denying his motion to suppress because Harper violated his Fourth Amendment rights by (1) prolonging the traffic stop beyond the time necessary to account for the alleged traffic violation and (2) exceeding the scope of Moffitt's consent to the vehicle search by searching under the hood of Moffitt's car.

## A. Standard of Review

"When reviewing a district court's decision concerning a motion to suppress, we review findings of fact under the clear-error standard and review conclusions of law de novo." *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022). Further, because the district court denied Moffitt's motion to suppress, "we consider the evidence in the light most favorable to the government." *United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015) (quoting *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013)).

## B. Analysis

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Police-initiated traffic stops like the one experienced by Moffitt constitute "a 'seizure' within the meaning of the Fourth Amendment." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (quoting *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)). Accordingly, if we determine that the traffic stop at issue in this case was unconstitutional, all evidence seized from Moffitt's car "must be suppressed as fruits of the poisonous tree." *Id.* (quoting *Blair*, 524 F.3d at 748); *see also United States v. Marsh*, 95 F.4th 464, 467 (6th Cir. 2024) ("The Fourth Amendment protects against unreasonable traffic stops by law enforcement officers.").

Traffic stops are typically constitutional initially if supported by reasonable suspicion that a traffic violation has occurred.[6] *United States v. Jordan*, 100 F.4th 714, 718 (6th Cir. 2024). "Yet even where a traffic stop is originally predicated on the requisite reasonable suspicion of illegal activity, the stop's duration may still exceed constitutional limits." *United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023). To stay within those constitutional limits and "prolong a traffic stop beyond its original 'mission,' police must have reasonable suspicion of additional wrongdoing," *Jordan*, 100 F. 4th at 718 (quoting *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)), because "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are— or reasonably should have been—completed," *Rodriguez*, 575 U.S. at 354. In the instant case, the government does not contend that Harper or any of the other officers at the scene of the traffic stop had reasonable suspicion to prolong the stop. Rather, the government argues that the traffic stop had not extended beyond the purpose of its original goal—investigating Moffitt's alleged traffic violation—at the time that Moffitt consented to Harper's search of his car. We disagree.

Traffic stops are only constitutionally permissible when "limited in scope and duration." *United States v. Taylor*, 121 F.4th 590, 594 (6th Cir. 2024) (quoting *Whitley*, 34 F.4th at 529). In etching the durational bounds of constitutional traffic stops initiated upon reasonable suspicion of traffic violations, we have advised that such stops may last "as long as it takes to perform routine traffic-violation tasks, such as asking a few questions, inspecting the driver's license and registration, and issuing a ticket." *Jordan*, 100 F. 4th at 718. With respect to the type of questions that officers may reasonably pose to drivers following the initiation of a valid traffic stop, we have recognized that "[q]uestions relating to travel plans, the driver's authority to operate the vehicle,

---

[6] "Reasonable suspicion exists when an officer has 'specific and articulable facts' that provide an 'objective basis for suspecting legal wrongdoing.'" *United States v. Jordan*, 100 F.4th 714, 718 (6th Cir. 2024) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

or the safety of the officer are the sorts of classic context-framing questions directed at the driver's conduct at the time of the stop that rarely offend our Fourth Amendment jurisprudence." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) (internal quotation marks omitted). In contrast, "[e]ven minor police actions aimed at 'detecting evidence of ordinary criminal wrongdoing' or any purpose beyond addressing the traffic infraction are not tasks incident to the stop." *United States v. Lott*, 954 F.3d 919, 924 (6th Cir. 2020) (quoting *Rodriguez*, 575 U.S. at 355). As we will explain, a few questions unrelated to a suspected traffic infraction may be permissible in limited circumstances. As to the permissible duration of a traffic stop, however, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 575 U.S. at 350.

Applying the above routine-traffic-violation-task framework to the instant case, Harper's initial question to Moffitt concerning Moffitt's travel destination was an "inquir[y] related to the traffic stop," and thus does not run afoul of the Fourth Amendment. *See United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016). Moffitt does not contend otherwise as to that question. Instead, Moffitt argues that Harper's questions concerning illegal items in the car and requesting consent to search were unrelated to the traffic stop and thus improperly extended the traffic stop. We agree. In doing so, we note the fact-specific nature of this conclusion. At the time that Harper asked Moffitt about illegal items in the car, Harper had already received information from Moffitt in response to the "context-framing" questions typical of routine traffic violation inquiries. *Williams*, 68 F.4th at 307. Indeed, Moffitt provided an explanation for both his alleged erratic driving and his intended destination when Harper first approached Moffitt's driver's side door after pulling Moffitt over. When Harper returned to Moffitt's driver's side door—after running a license check for Moffitt that did not reveal any outstanding warrants—Harper returned to questioning Moffitt

on these very same topics. In doing so, Harper also extended his inquiry beyond the reasons for the initial traffic stop by asking Moffitt about his activity at a hotel before the traffic stop. Thus, when Harper next asked Moffitt if he had any illegal items in his car, Harper was no longer asking questions "'reasonably related' to the purpose of the [traffic] stop." *United States v. Bell*, 555 F.3d 535, 542 (6th Cir. 2009) (quoting *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002)). Instead, Harper had begun an "[o]n-scene investigation into other crimes," *Rodriguez*, 575 U.S. at 356, and thus "abandoned [his] investigation of the traffic violation," *Whitley*, 34 F.4th at 530.

Nevertheless, the government correctly notes that Harper's questions seeking Moffitt's consent to search and inquiring about illegal items may still have been permissible even if unrelated to Moffitt's traffic infraction if they "did not measurably extend the duration of the stop." Appellee's Br., ECF No. 18, 7. This is true because "the Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention." *Rodriguez*, 575 U.S. at 354; *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). For that reason, that Harper's questioning did not relate directly to Moffitt's alleged traffic infraction does not amount to a per se violation of Moffitt's Fourth Amendment rights. Indeed, albeit before *Rodriguez*, we have previously declined to suppress evidence when similar questions unrelated to a traffic infraction have been posed by officers to drivers during routine traffic stops. *See, e.g.*, *United States v. Ellis*, 497 F.3d 606, 610, 613-15 (6th Cir. 2007) (reversing grant of a motion to suppress where an officer asked a driver "if there was anything illegal" in their truck).

Accordingly, instead of focusing solely on the content of Harper's questions to resolve our Fourth Amendment inquiry, we must determine whether Harper's actions "remained within the

proper duration and scope of a traffic stop." *Whitley*, 34 F.4th at 530. As explained above, Harper's questioning of Moffitt regarding illegal items inside his car fell outside the proper scope of a traffic stop initiated to investigate a minor traffic infraction. Determining whether the questions also fell outside the proper duration of the traffic stop requires a context-specific analysis because "[t]he maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). Therefore, we must heed the Supreme Court's directive that, absent reasonable suspicion of additional wrongdoing, individual traffic stops "may 'last no longer than is necessary'" to address the traffic infraction, *Rodriguez*, 575 U.S. at 354 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). Therefore, we must assess Harper's actions by considering what he "'in fact d[id],' not whether 'the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances.'" *United States v. Gomez*, 877 F.3d 76, 91 (2d Cir. 2017) (alteration in original) (quoting *Rodriguez*, 575 U.S. at 357).

In making this assessment, a brief sampling of our past cases applying these principles may prove instructive because determining whether officers' actions unconnected to the initial traffic stop are permissible requires a fact-sensitive approach. In *United States v. Garrido-Santana*, for example, we held that an officer's questioning of a driver about contraband during a traffic stop "did not exceed the time necessary to complete the original purpose of the traffic stop" because the officer "was still filling out [a] courtesy citation and . . . waiting for the return of the computer check on the vehicle's license plate." 360 F.3d 565, 575 (6th Cir. 2004). Similarly, in *United States v. Whitley*, which the government relies upon before this court, we determined that an officer's questions to a driver concerning whether he "had anything illegal in the vehicle and where he was coming from" were "permissible only because [the officer] asked these questions during

the time that [the driver] was retrieving his license and registration." 34 F.4th at 530. In discussing the traffic stop, *Whitley* did note that "[w]ithin a few seconds of receiving the requested documents, [the officer] noticed a scale in Whitley's lap and asked what the scale was for and if Whitley was going to buy weed." *Id.* *Whitley* acknowledged some ambiguity regarding whether those questions were permissible, but it ultimately determined that "Whitley's detention objectively exceeded the relevant scope of the traffic stop" when the officer then walked away from Whitley to confer with another officer about the scale because, "[a]t that point, the traffic stop had morphed into a drug investigation[.]" *Id.* More recently, in *United States v. King*, to which the government also directs our attention, we held that an officer's inquiry into a driver's potential drug possession, although "unrelated to the traffic stop," "did not unreasonably prolong the stop" because the question occurred while the officer "was in the process of verifying [the driver's] information." No. 24-1089, 2025 WL 2172432, at *6 (6th Cir. July 31, 2025).

The scenarios presented in *Garrido-Santana*, *Whitley*, and *King* differ from the facts of the instant case. As detailed above, by the time Harper inquired about illegal items in Moffitt's car, Harper had already run a check for outstanding warrants and asked Moffitt various questions concerning his activities that night. And unlike the questioning in *Whitley*, Moffitt had already provided Harper with his license and registration by the time Harper inquired about illegal items in Moffitt's car. *See* 34 F.4th at 527. Harper was holding Moffitt's vehicle registration while he inquired about illegal items in the car, but there is no indication from the record that Harper was actively reviewing the registration at the time that he posed this question to Moffitt.[7] "At that

---

[7] The magistrate judge's report mentions that Moffitt "produced" his registration to Harper, but does not discuss what, if anything, Harper did with the registration. R. & R., R. 37, Page ID #110. The district court similarly described Harper receiving the registration from Moffitt and noted that Harper "had not yet completed . . . a check of Moffitt's vehicle registration" at the time he requested Moffitt's consent to search the vehicle. Mem. Op. & Order, R. 41, Page ID #147.

point, the traffic stop had morphed into a [separate] investigation." *Id.* at 530. That this transformation occurred earlier here than in *Whitley* is of no moment, given the distinct factual circumstances as compared to the timing of the officer's receipt of Whitley's documents and the questions about the scale in that case. *See id.* In *King*, bodycam footage produced by the government depicted the relevant officer "using the computer in his patrol car" to conduct a license check while questioning the driver about illicit drug possession. 2025 WL 2172432 at *6. No such license check or other inquiry into the circumstances leading to the traffic stop in the present case was ongoing at the time Harper asked Moffitt about illegal items because, by that point, Harper had completed the license check and begun asking about Moffitt's actions at the hotel. While Harper had not yet issued a traffic ticket to Moffitt for his alleged erratic driving, that fact alone does not guide our determination of a traffic stop's permissible length or whether tasks reasonably tied to the traffic stop were still ongoing because "[a] stop may be unlawfully extended beyond the initial purpose even if the officer never formally completes the citation." *Bell*, 555 F.3d at 541.

Rather, as we explained in *Whitley*, the relevant inquiry in determining whether a traffic stop has been prolonged such that additional reasonable suspicion of illegal activity is required is whether "the stopped party can show either that the [police activity] was not tied to the traffic infraction or that the traffic stop reasonably should have been already completed." 34 F.4th at 531–32 (internal quotation marks and emphases omitted). Here, for the reasons explained above, Harper's question concerning illegal items in Moffitt's car was not tied to the traffic infraction that led to the traffic stop. While Harper posed that question shortly after asking Moffitt questions permitted by our caselaw, "[u]nder the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity." *United States v.*

*Urrieta*, 520 F.3d 569, 578 (6th Cir. 2008); *see also Williams*, 68 F.4th at 309 ("[A]ny time (no matter the duration) added to a traffic stop beyond what was reasonably necessary to investigate the original cause for the stop must be grounded in independent reasonable suspicion."); *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) ("[A]ny extension of a traffic stop absent independent reasonable suspicion is improper."). Such is the case here, where Harper, through his questioning regarding Moffitt's activities at the hotel, moved beyond the scope of the traffic stop and began probing Moffitt's unrelated actions. Because this probing of unrelated actions occurred at a time when no investigatory tasks tied to the original traffic infraction were ongoing, the traffic stop was extended in contravention of Moffitt's Fourth Amendment rights. The district court's conclusion to the contrary is erroneous.[8]

This result is consistent with both our circuit precedent and the analyses of other federal courts of appeal presented with similar circumstances. We have repeatedly held that an officer's "action extend[ing] the scope and duration of [a] stop beyond that necessary to issue a citation" violates a driver's Fourth Amendment rights when the officer "ha[s] not developed reasonable, articulable suspicion of criminal activity by that point." *Blair*, 524 F.3d at 752. Such actions by officers which may unconstitutionally extend a traffic stop include mere "unrelated questioning[.]" *Lott*, 954 F.3d at 924. Accordingly, in *United States v. Stepp*, we held that an officer's questions unreasonably "prolonged [a] traffic stop beyond its original purposes because the topics covered more than just context-framing questions." 680 F.3d 651, 663 (6th Cir. 2012). Our sister circuits have also held that officers' questions during traffic stops to drivers and car passengers concerning

---

[8] The government has not argued on appeal that we should affirm the district court's denial of Moffitt's motion to suppress on the basis of the good-faith exception to the exclusionary rule. The government has therefore forfeited that argument. *See United States v. Archibald*, 589 F.3d 289, 301 n.12 (6th Cir. 2009).

potential criminal conduct of which the officers had no reasonable suspicion violate the Fourth Amendment when asked in a manner that extends the stop. *See, e.g.*, *United States v. Campbell*, 26 F.4th 860, 885 (11th Cir. 2022) (en banc) (holding that an officer "unlawfully prolonged [a traffic] stop" by questioning the driver about potential illegal items in the car); *United States v. Landeros*, 913 F.3d 862, 868–70 (9th Cir. 2019) (holding that officers' questioning of car passenger during a traffic stop unlawfully extended the stop); *United States v. Clark*, 902 F.3d 404, 411 (3d Cir. 2018) (holding that an officer "impermissibly extended [a traffic] stop" by asking the driver about his criminal history). We reach the same conclusion here. A decision to the contrary would effectively "[s]anction[] th[e] kind of brief prolongation" of a traffic stop which the Supreme Court has expressly labeled unconstitutional. *Williams*, 68 F.4th at 309. Mindful of the Supreme Court's directive, we hold that Officer Harper unconstitutionally prolonged Moffitt's traffic stop to probe for potential criminal conduct for which he lacked independent reasonable suspicion.

Because we hold that the traffic stop was prolonged in contravention of the Fourth Amendment, we do not address Moffitt's and the government's competing arguments concerning the scope of Moffitt's consent to search his vehicle. No matter the scope which we might ascribe to Moffitt's consent, "the consent was tainted by the illegality" of the prolonged traffic stop and therefore "ineffective to justify the [subsequent] search." *Royer*, 460 U.S. at 507–08. We therefore reverse the district court's judgment on the sole ground that its determination regarding the traffic stop extension was erroneous.

### III. CONCLUSION

For the reasons stated above, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.